FILED

2022 Jun-16  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **STACEY DENNING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 5:20-cv-1753-CLS** |
| | ) | |
| **TOPRE AMERICA** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

Plaintiff, Stacey Denning, was fired from her position as a "Team Leader" by defendant, Topre America Corporation ("Topre"), for allegedly inappropriate conduct, and for use of her personal cell telephone in violation of company policy. Plaintiff contends that she was treated less favorably than male employees who engaged in similar conduct, and she asserts a claim of sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). This opinion addresses defendant's motion for summary judgment: Doc. no. 25.

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

other words, summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration and emphasis supplied).

2

# I.  FACTS

Topre is an automotive parts supplier, located in Cullman, Alabama, and produces stamped and welded assemblies for Honda, Nissan, and Toyota vehicles.[1]  Plaintiff was hired by Topre as an Assembly Operator on June 11, 2012.[2]  She was disciplined with the following written warning on September 9, 2015:

> Following a comprehensive investigation into the incident which occurred between you and a fellow co-worker on Friday (September 4, 2015), it has been determined that your actions/conduct were unacceptable relative to the standards management has established at Topre America.  The Company strongly believes that each associate is entitled to be treated with dignity and respect, and each associate carries this same responsibility with respect to their coworkers, regardless of their TAC or Temporary designation.
>
> Disrespectful treatment of your coworker will not be tolerated, nor should you under any circumstances physically touch another associate in any way that could be deemed inappropriate.  This notice will serve as a formal Written Warning that any repeat incidents of this nature will result in further disciplinary action, up to and possibly including immediate termination of your employment.
>
> We are hopeful that you will be able to meet the above stated conditions that will enable you to remain with the Company.  If you have any questions concerning the intent or content of this memo, please contact me directly.

---

[1] *See* doc. no. 27-1 (2018 Topre America Employee Handbook), at ECF 61; doc. no. 27-2 (Deposition of Natalie Caudle, Senior Manager for Human Resources), at 64.  **NOTE**:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[2] Doc. no. 27-3 (Natalie Caudle declaration) ¶ 16.

Exhibit 11 to doc. no. 27-1 (Plaintiff's deposition), at ECF 110.  The warning was issued by Heath Harden, Assistant Manager of the Assembly Department.  *Id.*  A complete description of the incident leading to the issuance of the written warning is not in the record, but the warning appears to have been based upon an investigation of statements by fellow employees alleging that plaintiff was disruptive and grabbed the arm of one of her co-workers.[3]

Three years after the foregoing incident, plaintiff was promoted to "Assembly Team Leader."[4]  Her duties included, among other things, leading a team of fourteen to sixteen employees, and interacting with the Quality Department.[5]  Plaintiff served in that capacity without incident until July 26, 2019.  On that date, a co-worker named Kristofer ("Sebastian") Kaldwell sent the following email message to Mary Glenn in the Human Resources department:[6]

> Hi.  This is Kristofer Kaldwell.  I go by Sebastian.  I was debating even bringing this up due to the possibility that it could be viewed as some type of retaliation on my part, however, after the 4:00 break this morning I decided to go ahead and bring it to attention to someone [*sic*].  You're the only part of HR whose email I have, so, I do hope you are the correct person.

---

[3] Exhibits 12-14 to doc. no. 27-1 (Plaintiff's deposition), at ECF 111-14.

[4] The promotion occurred on December 10, 2018.  Exhibit 2 to doc. no. 27-1 (Plaintiff's deposition), at ECF 90.

[5] Doc. no. 27-1 (Plaintiff's deposition), at 24-25.

[6] Ms. Glenn's employment had ended on July 6, 2019, however.  Consequently, the email message was forwarded automatically from Ms. Glenn's account to Natalie Caudle, who was, at the time, Senior Manager for Human Resources.  Doc. no. 27-3 (Natalie Caudle declaration) ¶¶ 2, 30-31.

When I returned to work, I was bombarded with questions from several people asking me if I really ran over someone's foot with my forklift. When I told them, no, I did not.  I was informed that this person, Jessica Morris, had bragged that she got me off the forklift.  I told them, no, she did not, at least, that isn't what HR had told me was the reasoning for the removal of my forklift position.

I was, also, told by a few coworkers, Gene (don't know his last name, he a Temp that runs MAG 31),[7] Garth,[8] Patty Crabtree, and a few others that I don't really know their names, that Jenn (again, don't know her last name, either)[9] had bragged, too, that she got me off the lift and that I was throwing actual parts at her that Friday that she went to the Supervisor.

Again, at the time, I tried to shrug it off and go on with my shift. However, at 4am break, the team leader, Stacey, was going on about how she wanted to choke someone out of annoyance and Jenn, sitting at the same table as Stacey and Gene outside, was repeatedly saying "Choke dat ho" quoting a Madea movie[10] and constantly calling people dumbasses.

The same person who got upset because I didn't bring her the totes the way she wanted me to, making claim that I was throwing totes around or throwing totes at her or throwing parts at her (I couldn't keep up with the varying stories I was being told) was sitting outside calling other people dumbasses and that these people should be choked. . . .

I realize my suspension cannot be undone, nor will my forklift privileges be returned to me, but, I'm just asking for a bit of fairness from all of this.

---

[7] The record reflects that "Gene" is Gene Stranahan.  *See* doc. no. 27-2 (Natalie Caudle Deposition), at 171-72.

[8] Garth Ashtone.  *See id.* at 172.

[9] Jennifer West.  *Id.* at 123.

[10] This apparently is a reference to a fictional character created and portrayed by director Tyler Perry, and depicted in a series of films.  *See* en.wikipedia.org/wiki/Madea (last visited June 1, 2022).

Exhibit 3 to Doc. no. 27-3 (Natalie Caudle declaration), at ECF 32.  2019.[11]

The suspension referenced by Kristofer Kaldwell in the foregoing email was imposed by Natalie Caudle, Senior Manager for Human Resources, and was in effect from Monday, July 22, through Wednesday, July 25, 2019, as reflected in the final paragraph of the following record of Kaldwell's performance and conduct deficiencies:

> 4/16/2019 - Property damage - picked up a set of 150B (yellow) containers and caught the stack next to the ones he was picking up, causing them to lean right and hitting a pallet rack in shipping damaging the grate.

> 5/28/2019 - Property Damage - changing out a set of containers and bumped and scratched the LCD screen in the cell and knocked off the E-Stop Button.

> 6/5/2019 - Near miss - pulling an empty container of a stack of 64" inch Ropak's, as he was lifting the container up 10 foot he didn't separate his forks wide enough to keep it stationary, as he was turning the container fell off the forks and landed into the floor between G4 subs and the Destruct Room.

> 7/11/2019 - Near Miss - Operator was standing close to Sebastian Kaldwell's lift talking to him, during the conversation Sebastian had his foot on the pedal, he began to move the lift, as the lift was moving the operators left foot was in the way of his tire and ran over her steel toe. Operator failed to report this incident on the day it happened.  This was reported on 7/16/2019.

> 7/12/2019 - Sebastian's actions and attitude have been inappropriate towards assembly operators.  His attitude progressed through the night

---

[11] Doc. no. 27-3 (Natalie Caudle declaration) ¶¶ 2, 30-31.

and turned into violent behavior.

> As the following [*sic*] incidents appear this leads into a written and Suspension, Having a Near Miss with a forklift running over an operator's steel toe shoe and having an aggressive attitude Towards other associates.  This follows with the previous written Disciplinary action received on April 25th 2019.[12]  Sebastian will be removed from his position as a Forklift operator and moved to a level two Assembly Operator position.  This move will take effect immediately on Monday 22nd - Wednesday 24th of July 2019.  Return date on July 25th  2019.

Doc. no. 27-2 (Natalie Caudle deposition), at ECF 143 (punctuation, capitalization in original).

Shortly thereafter, on or about August 1, 2019, plaintiff lodged two written complaints about her interaction with employees in the Quality Department.[13]  Natalie Caudle initiated investigations of not only those lodged by plaintiff on August 1st, but also Kaldwell's July 26, 2019 email complaint.  She directed Carrie Anderson, the newly hired Assistant Manager for Human Resources, to lead the investigations.[14]

---

[12] That written disciplinary action stated the following:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

**Details**: Failure to follow safety procedures in place.  Had two consecutive accidents previous to the last one placed on 4/23/2019.  This last accident was caused by picking up some APMM sc3 containers and knocking over the stack next to it and resulting the containers to fall [*sic*] and hit a pallet Rack and damaging a Grate.

Exhibit 24 to doc. no. 27-5 (Carrie Anderson deposition), at ECF 82.

[13] Exhibit to doc. no. 27-3 (Natalie Caudle declaration), at ECF 53-61.

[14] Doc. no. 27-3 (Natalie Caudle declaration) ¶ 33.

Kaldwell was jointly interviewed by Anderson and Caudle on August 6, 2019, as
reflected in the following notes compiled by Carrie Anderson:

> **Sebastian Kaldwell** stated the following:
>
> - [Plaintiff] heard Sebastian make comments about her and things became heated (verbally)
>
> - There have been problems with [plaintiff] for a couple of months
>   - She was rude over the radio call to James Melvin when she was asking him about doing the "middle."
>   - Pam Kanaday witnessed [plaintiff] get upset with one of the weld techs and she made the comment "if that little bitch . . ."[15]
>
> **Sebastian (Kris) Kaldwell**
>
> We spoke to Sebastian regarding a similar but unrelated incident; however, during his interview he made the comment that he didn't think there was any fairness in his disciplinary actions when there is a team leader going along with other employees and saying that "dumbasses need to be choked." When asked who the team leader and associates were, he said Stacey [plaintiff], Jenn [West], Tyra [Jackson], and Gene [S.].

Exhibit to doc. no. 27-5 (Carrie Anderson deposition), at ECF 83 (emphasis in
original, alterations supplied).

---

[15] The full statement, recorded by an employee in the Quality Department named Dee Anne Roberson, was: "if that little b . . . . of a weld tech ever got smart with Stacey [*i.e.*, plaintiff] again on the radio, Stacey was going to make her cry." Exhibit to doc. no. 27-5 (Carrie Anderson deposition), at ECF 92 (alteration supplied).

Carrie Anderson and Natalie Caudle also interviewed Quality Department employees Dee Anne Roberson and Gina Hunter on that same date.[16] Ms. Roberson corroborated Kaldwell's statements about plaintiff's interaction with James Melvin and Pam Kanaday, and said there had "been problems" with plaintiff "for a couple of months."[17] Gina Hunter stated that she witnessed plaintiff "getting ill with employees on multiple occasions," and gave examples of incidents that had occurred over the previous three to four months.[18] Anderson and Caudle then interviewed plaintiff, who stated that Dee Anne Roberson had "yelled" at her, and that "communication was lacking from the Quality Department."[19]

Two weeks later, on August 20, 2019, Carrie Anderson and Natalie Caudle interviewed Jenn West, who said, with reference to Kaldwell's complaint, that she, plaintiff, and two other employees were talking about their frustrations with their jobs, and that she (Jenn West) made the comment "dumbasses always leaving" (*i.e.*, referring to a co-worker who left early, requiring her to "take up his slack").[20] Gene Stranahan was also interviewed on that date, and he said he heard plaintiff "and Jenn

---

[16] Exhibit to doc. no. 27-5 (Carrie Anderson deposition), at ECF 84.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at ECF 85.

quoting 'choke that ho' while they were on break."[21]

Tiffany Graves and plaintiff were interviewed by Carrie Anderson and Payton Reid on August 21, 2019.[22]  That interview was directed toward their discussion with other employees of the ongoing investigation.[23]

Additionally, Natalie Caudle received written complaints about plaintiff's interaction with co-workers, particularly those employed in the Quality Department. Those reports predated, or were contemporaneous with, the interviews conducted by Caudle and Anderson for the purpose of investigating plaintiff's complaints about the Quality Department.[24]

Sometime prior to the foregoing investigations, during July of 2019, plaintiff used her cell telephone to record her conversation with two employees, but without disclosing to the other employees that their statements were being recorded.[25] Plaintiff testified that she recorded the conversation in order to document what she perceived to be a problem with "labeling."[26]  Plaintiff sent the recording to Natalie Caudle,[27] who stated that she did not agree that the statements revealed a labeling

---

[21] *Id.*

[22] *Id.*  Payton Reid's position is not specified.

[23] *Id.*

[24] *See* Exhibit to doc. no. 27-5 (Carrie Anderson deposition), at 87-92.

[25] Doc. no. 27-1 (Plaintiff's deposition), at 56-57.

[26] *Id.* at 57.

[27] Doc. no. 27-3 (Natalie Caudle declaration) ¶ 27.

problem.  Caudle also told plaintiff that she would likely be subject to discipline for recording the employees without their consent, but Caudle did not take immediate action.[28]

Following investigation of the complaints, Carrie Anderson and Natalie Caudle decided to recommend that plaintiff's employment be terminated.[29]  To that end, in accordance with Topre policy and acting at Caudle's direction, Carrie Anderson prepared a "Circle Sheet" to secure the approval of members of the supervisory chain for decisions to terminate employment.[30]  The document was circulated, in turn, to the following officials:  Joyia Marsh, plaintiff's direct supervisor; Jennifer Turner, Assembly Department Manager; Justin Hill, Topre Vice President; Carrie Anderson, Assistant Manager for Human Resources; Natalie Caudle, Senior Manager for Human Resources; Brad Pepper, Senior Vice President; and Hideo Shimizu, President of Topre America.  Each person concurred with the recommendation to terminate

---

[28] *Id.* ¶ 28.  Topre limited employees' use of cell phones.  Authorized Associates (*i.e.*, those who were provided cell phones by Topre) were permitted to use the phones for business-related calls. "Unauthorized Associates" could carry personal cell phones, but could not use them on the plant floor "except for authorized business uses."  The policy provided an exception for employees who had a relative with "a serious life threatening condition of a temporary nature."  Exhibit 1 to doc. no. 27-1 (2018 Topre America Employee Handbook), at 85-86.

[29] *See* doc. no. 27-6 (Carrie Anderson declaration) ¶¶ 3-4; doc. no. 27-3 (Natalie Caudle declaration) ¶ 44.

[30] Doc. no. 27-5 (Carrie Anderson deposition), at 34-35.

plaintiff's employment.[31]

Plaintiff's employment was terminated on August 22, 2019.  Jennifer Turner, Assembly Department Manager, and Carrie Anderson, Assistant HR Manager, provided the following document to plaintiff:

> We have received several recent complaints about your inappropriate behavior which does not meet Topre's expectations for any of its employees, but especially its team leaders.  During the investigation of these complaints, we confirmed the following:
>
> a)    You are constantly in the quality department complaining and making negative statements about other employees.  These complaints are often not founded or not properly directed to Quality and, of course, any true issues of employee performance should be handled through coaching or the disciplinary process, if necessary.
>
> b)    Oftentimes you enter the lab demanding actions from the employees that are not their responsibility, nor yours to direct.
>
> c)    On multiple occasions you have been rude and present a hateful attitude toward the employees you come in contact with.
>
> d)    You have used and tolerated inappropriate language including saying that you would choke someone and then permitting another employee to echo you and use the terms "ho" and "dumbass."  While we do not believe you or this other employee were planning violence to others, we do not tolerate violent or sexually explicit language and as a leader you should not have used or permitted the use of such language.
>
> e)    Additionally, on July 12, you violated the company cell phone

---

[31] *See* Exhibit to doc. no. 27-3 (Natalie Caudle declaration), at ECF 42; doc. no. 27-4, at ECF 26.

policy by recording two other team members without their knowledge or consent.  You have confirmed that you did this. You were trained on our company cell phone policy on June 6, 2019.

On September 9, 2015, you received a Written Warning for your inappropriate conduct toward other employees.  As a result of the recent investigation, and your previous formal written warning for the same behavior, it is the decision of Topre America to end your employment effective immediately.

Exhibit 6 to doc. no. 27-4 (Natalie Caudle declaration), at ECF 28.

Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission on September 19, 2019,[32] and that agency issued a notice of plaintiff's right to sue on August 18th of the following year.[33]  This suit followed.

## II.  DISCUSSION

Plaintiff contends that she has supplied sufficient evidence to show that her gender was both *a* motivating factor among others that resulted in the decision to terminate her employment (a so-called "mixed-motive" theory), as well as *the* motivating factor in her termination (a "single motive" theory).[34]

---

[32] Doc. no. 1 (Complaint), Exhibit A.

[33] *Id.*, Exhibit B.

[34] Doc. no. 34 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 14. *See also Quigg v. Thomas County School Dist.*, 814 F.3d 1227, 1235 n.4 (11th Cir. 2016) ("Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action. Specifically, they serve as alternative causation standards for proving discrimination." (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2530 (2013)).

The Eleventh Circuit has explained that the language of Title VII permits a plaintiff to proceed with different legal theories in employment discrimination cases. *See Quigg v. Thomas County School District*, 814 F.3d 1227, 1235 (11th Cir. 2016). That results from the fact that Title VII not only prohibits employers from discriminating "because of" an employee's sex or other protected characteristic, *see* 42 U.S.C. § 2000e-2(a),[35] but also because the Act forbids adverse employment actions where the protected characteristic was "*a* motivating factor" for the action taken, "even though other factors also motivated the practice." *Id.* § 2000e-2(m).[36]

Where, as here, a plaintiff does not offer direct evidence of gender discrimination, she may establish her claim by presenting circumstantial evidence of the defendant's discriminatory motive.  In *Quigg*, the Eleventh Circuit explained that

---

[35] 42 U.S.C. § 2000e-2(a) provides, in its entirety:

It shall be an unlawful employment practice for an employer —

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's race, color, religion, sex, or national origin. [Emphasis supplied.]

[36] 42 U.S.C. § 2000e-2(m) provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, *even though other factors also motivated the practice* [emphasis supplied]."

the analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), is not applicable to claims based upon a mixed-motive discriminatory theory,

because it "is predicated on proof of a single, 'true reason' for an adverse action."

*Quigg*, 814 F.3d at 1237.   Instead, claims based upon a mixed-motive theory, the

appropriate inquiry is

> whether a plaintiff has offered "evidence sufficient to convince a jury
> that:  (1) the defendant took an adverse action against the plaintiff; and
> (2) [a protected characteristic] was *a* motivating factor for the
> defendant's adverse employment action." In other words, the court must
> determine whether the "plaintiff has presented sufficient evidence for a
> reasonable jury to conclude, by a preponderance of the evidence, that
> [her protected characteristic] was a motivating factor for [an] adverse
> employment action."

*Id.* at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir.

2008) (alterations in original)).

In this case, plaintiff provides no detailed argument to show that she has a

claim under a mixed-motive theory of discrimination.   Instead, she said only that she

had

> presented substantial evidence to allow a jury to determine that
> Plaintiff's sex was both *a* motivating factor for the defendant's adverse
> employment action under a mixed motive theory, and substantial
> evidence that Plaintiff's sex was *the* motivating factor pursuant to
> single-motive claim of discrimination.

Doc. no. 34 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment),

15

at 14.  That conclusory statement will not, alone,  sustain a mixed-motive theory of discrimination.  The court therefore turns to whether plaintiff has a claim under a single-motive theory.

In a single-motive case, federal courts typically evaluate the sufficiency of circumstantial evidence to demonstrate an employer's intention to discriminate using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas*, *supra*, and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under that three-step framework, a plaintiff must initially establish a *prima facie* case of discrimination.  If she does so, the employer then must proffer a legitimate, non-discriminatory reason for the adverse employment action in order to avoid a judgment in favor of the plaintiff.  If the defendant does so, the burden shifts back to the plaintiff to establish that the defendant's proffered reason is but a pretext for discrimination.

In order to establish a *prima facie* case of disparate disciplinary treatment under Title VII, a plaintiff must show: (1) that she is a member of a protected class (*e.g.*, a female); (2) that she engaged, either disputedly or admittedly, in misconduct similar to that of a similarly situated co-employee outside her protected class (*e.g.*, a male); and (3), that despite such similarities, she was disciplined differently than the male co-employee.  *See, e.g.*, *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir.

16

2000); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999). Defendant contends that plaintiff has not demonstrated that she was treated less favorably than a similarly situated male employee and, thus, has not established a *prima facie* case.

In response, plaintiff does not argue that she *has* established a *prima facie* case. Instead, she contends that she need not do so. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment in an employment discrimination case."). *Smith* held that, even without suitable comparators, "the plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory motive." *Id.* (alteration supplied). As the Eleventh Circuit later explicated in the case of *Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019):

> This, of course, is perfectly logical. Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator. Among other things, a proper comparator simply may not exist in every work place. Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'"

*Id.* at 1185 (quoting *Silverman v. Board of Education of Chicago*, 637 F.3d 729, 734

(7th Cir. 2011), *overruled by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)).

Evidence that might create a "convincing mosaic of circumstantial evidence" includes: "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn"; systematically better treatment of similarly situated employees; and, other circumstantial facts tending to show that the employer's justification is pretextual. *Id.*

Plaintiff offers the following circumstantial evidence that, she contends, depicts a "convincing mosaic" from which a jury could infer intentional discrimination: (1) plaintiff's favorable performance record; (2) Kristofer Kaldwell's disciplinary record; (3) "Kaldwell's thinly veiled threat of a future sex discrimination claim"; (4) the investigation of Kaldwell's allegations of plaintiff's comments about "choking"; (5) Topre's reasons for terminating plaintiff's employment, including for violation of its cell phone policy; (6) Topre's failure to follow its progressive discipline policy; (7) defendant's use of its "circle sheet" policy to formalize termination decisions; and, (8) defendant's decision to fill plaintiff's position with a female.[37]

Unfortunately for plaintiff, the circumstantial evidence that she has presented is not convincing, and does not form into a mosaic depicting an inference of

---

[37] *See* doc. no. 34 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 15-32.

intentional discrimination.  First, her favorable *performance* record simply is not relevant to whether her termination was motivated by discrimination.  Plaintiff was discharged for *conduct*, not *performance*, issues.

Second, plaintiff contends that Kaldwell's disciplinary record shows that she was treated less favorably than he was.  The evidence shows that Kaldwell began employment on June 18, 2018, and obtained a forklift driver position on March 4, 2019.[38]  He received a written disciplinary action on April 25, 2019, for failing to follow safety procedures on several occasions.[39]  On July 22, 2019, he was removed from his position as a forklift operator, and suspended for three days, as a result of four more performance issues (and also because, on July 12, 2019, his "actions and attitude [were] inappropriate towards [*sic*] assembly operators").[40]  Kaldwell had no prior conduct-based disciplinary actions.  In contrast, plaintiff *had* received a written disciplinary action for inappropriate conduct, in which she was warned that "repeat incidents" of "disrespectful treatment" of co-workers could result in termination.[41]  Topre found, following its investigation of Kaldwell's and plaintiff's complaints, that plaintiff had again engaged in inappropriate conduct by her treatment of Quality

---

[38] Doc. nos. 35-18 and 35-19.  Plaintiff contends that this change of position was a promotion, but the Personnel Action Form does not support that contention.

[39] Exhibit 24 to doc. no. 27-2 (Natalie Caudle deposition), at ECF 142.

[40] *Id.* at ECF 143.

[41] Exhibit 11 to doc. no. 27-1 (Plaintiff's deposition), at ECF 110.

Department employees, as well as by her participation in (and tolerance of) the "Madea" movie reference, in contravention of her duties as a supervisor.

Third, plaintiff's contention that Topre terminated her in order to ward off a putative sex discrimination claim by Kaldwell is purely speculative.  Plaintiff points to two of Kaldwell's alleged statements that, she suggests, indicate that Kaldwell was contemplating raising a claim that he was subjected to discriminatory conduct.  To start, plaintiff contends that Kaldwell's statement in the email message sent to Mary Glenn in Human Resources,[42] "just asking for a bit of fairness from all of this," indicates that he believed he was treated less favorably than plaintiff, based upon his allegation that she made inappropriate statements without (as yet) consequence.  That statement, however, is subject to interpretation, and it is not clear that Kaldwell meant that what he perceived as a lack of "fairness" was related to disparate treatment based upon gender.

Second, plaintiff refers to a written complaint by Jennifer Darnell that Mr. Kaldwell approached her (Darnell) on July 29, 2019, and allegedly stated that "must be nice that people of your gender can get away with anything here."[43]  Topre followed up on Darnell's complaint on August 6, 2019, characterizing it as a "formal

---

[42] See note 6, *supra*.

[43] Doc. no. 35-2.

complaint of harassment."  The "conversation log," authored by Jennifer Turner,

memorializing the results of the investigation reads:

> On July 30, 2019, a formal complaint of harassment was filed against you.  During the investigation the following was identified:
>
>> a)     It has been witnessed that you made the following derogatory gender remarks toward female coworkers.
>>
>>> i.      "It must be nice that people of your gender can get away with anything here."
>>>
>>> ii.     "If I were a woman, I wouldn't have lost my forklift position or my money."
>
> As a result of the above incident, the following actions are to be followed:
>
>> (a)     Be respectful of fellow employees and refrain from singling anyone out for rumors you have heard or for a disciplinary decision you may not agree with.
>
> According to the [Topre] Employee Handbook, pages 13-15, "Topre is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment.  Actions, words, jokes, or comments based on an individual's sex, race, color, national origin, age, religion, disability, genetic information, military and/or veterans' status or any other legally protected characteristic will not be tolerated is not tolerated [*sic*]."  Such behavior is considered a violation of associate conduct and work rules that can result in disciplinary action, up to and including termination.  Any additional reported incidents will result in further disciplinary actions, up to and including termination of your employment with Topre America.
>
> We are hopeful that you can meet the stated conditions that enable you

to remain with the company.

Doc. no. 35-3 (alteration supplied).  Kaldwell did not receive formal discipline for this incident.

The context for Kaldwell's statement to Jennifer Darnell is not evident, and the statement does not support plaintiff's theory that *she* was disciplined in order to "rebut" a potential sex discrimination claim by Kaldwell.  It requires quite a leap of imagination to infer from this sequence of events that Topre terminated plaintiff, "because of her sex, to create 'a bit of fairness.'"[44] *See, e.g.*, *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) ("At the summary judgment stage, . . . 'evidence,' consisting of one speculative inference heaped upon another, [is] entirely insufficient.") (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

Plaintiff's argument that Topre's reason for dismissing her were "made up" likewise falls short.  Topre conducted an investigation of the complaints by plaintiff about Quality Department employees, as well as their complaints about their interactions with plaintiff.  From those employee interviews, Topre concluded that plaintiff's conduct was unacceptable, especially for an employee in a supervisory role.  Topre documented the employee interviews, as well as the complaints, and

---

[44] Doc. no. 34 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 19.

plaintiff does not suggest that the employee comments and complaints by the Quality Department employees about plaintiff were based upon or motivated by her gender.

Topre also terminated plaintiff's employment due to her inappropriate comments using the terms "ho" and "dumbass," and tolerating her co-workers' use of those terms during the incident reported by Kaldwell. All of the participants admitted using those terms, but maintained that they were "joking." Even so, Topre considered plaintiff's conduct, in addition to the other conduct detailed in the notice, to be grounds for termination.

Plaintiff asserts that she was treated less favorably than a specific male employee, Josh Gothard, who allegedly engaged in similar conduct. Gothard and co-worker Matthew Palmer were not getting along well during one of the shifts on which they worked during March of 2019.[45] Gothard's wife, Shelby, who apparently also worked for Topre, went to Gothard's work station to tell him that she had completed her shift. Gothard allegedly told her about his conflict with Palmer and, according to Palmer's written statement, said, "This asshole won't stop being rude. Too bad murder isn't legal."[46] Gothard disputed Palmer's account, and stated that his wife had made a joking comment trying to defuse the tension.[47] None of the co-workers

---

[45] Doc. no. 27-4, at ECF 29-37.

[46] Doc. no. 27-4, at ECF 36.

[47] *Id.* at 33.

identified by Palmer as witnesses heard the exchange.[48]   Nonetheless, Topre investigated, and Gothard received a written warning for the incident.[49]   Based upon these events, plaintiff contends that she was treated less favorably than a male employee for similar "joking" behavior.   Plaintiff's argument lacks merit.   She, in contrast to Gothard, had a prior disciplinary record; and, her comments were not the sole reason for her termination.

Next, plaintiff argues that Topre's additional justification for terminating her employment — *i.e.*, that she violated defendant's cell telephone policy by recording co-workers without their knowledge — was contrived, especially since some time passed before she was disciplined for the offense.   That argument is unavailing. Plaintiff admittedly recorded her co-workers, and Topre found that action violated its rules on the use of cell phones.   While plaintiff disagrees with that conclusion, and the timing of the discipline — *i.e.*, after Topre received Kaldwell's complaint — it is not the court's role to second-guess defendant's characterization of plaintiff's conduct where she has produced no evidence that she was disciplined because of her sex.   *See, e.g.*, *Chapman*, 229 F.3d at 1030 (11th Cir. 2000) (collecting cases).

---

[48] *Id.* at 31-37.

[49] Doc. no. 35-22.  The warning was for "[d]isrespectful comments or conduct that negatively impact production or morale and considered inappropriate or threatening." *Id.*  According to Ms. Caudle, the warning was issued by Jason Nicklaus, HR Representative.  Doc. no. 27-3 (Natalie Caudle declaration) ¶ 85.  This was Gothard's first disciplinary action, but the first step of the progressive discipline policy — verbal warning — was bypassed.  *Id.* ¶ 86.

Plaintiff's allegation that Topre failed to adhere to its progressive discipline policy likewise cannot support her claim that she was discriminated against on the basis of gender.  That policy was:

> Topre America will administer equitable and consistent discipline for unsatisfactory conduct or performance in the workplace.  The best disciplinary measure is the one that does not have to be enforced and comes from good leadership and fair supervision at all employment levels.
>
> The company's best interest lies in ensuring fair treatment of all Associates and in making certain that disciplinary actions are prompt, uniform, and impartial.  The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the Associate for satisfactory service in the future.
>
> Although both the Associate and Topre America have the right to terminate employment at will, with or without cause or advance notice, Topre America *may use progressive discipline at its discretion*.
>
> Disciplinary action *may* call for any of four steps — verbal warning, written warning, suspension with or without pay, or termination of employment — depending on the severity of the problem and the number of occurrences. *There may be circumstances where one or more steps are bypassed*.
>
> Progressive discipline means that, with respect to most disciplinary problems, the company approach will be to correct the problem at the lowest possible level and communicate the next step if the problem is not corrected.  These steps will *normally* be followed: a first offense may call for a verbal warning; a written warning may follow the next offense; another offense may then lead to a suspension; and, still another offense may then lead to termination of employment.  If more than 12 months have passed since the last disciplinary action, the process will *normally* start over *unless the infraction is the same or similar*,

indicating that the Associate has not corrected the problem.

Topre America recognizes that there are certain types of Associate problems that are serious enough to justify either a suspension, or, in extreme situations, termination of employment, without going through the usual progressive discipline steps. Topre America reserves the right to move to any step in the progressive discipline process, depending upon the nature of the offense, its impact upon other Associates, the Associate's corrective action history, or any other factor that may be applicable.

While it is impossible to list every type of behavior that may be deemed a serious offense, the Associate Conduct and Work Rules policy includes examples of problems that may result in immediate suspension or termination of employment. However, the problems listed are not all necessarily serious offenses, but may be examples of unsatisfactory conduct that will trigger progressive discipline.

By using progressive discipline, we hope that most Associate problems can be corrected at an early stage, benefitting both the Associate and the company.

Doc. no. 27-1 (2018 Topre America Employee Handbook), at ECF 81 (emphasis supplied). The policy clearly puts Topre's employees on notice that employment was at will, that the use of progressive discipline was within Topre's discretion, and that steps outlined in the progressive discipline policy could be bypassed, also at Topre's discretion. Plaintiff's 2015 written warning expressly stated that *any* repeat offenses — *e.g.*, disrespectful treatment of co-workers — would lead to further disciplinary action, including immediate termination of employment. Her termination was based, at least in part, on her disrespectful treatment of Quality Department employees —

conduct similar to that for which she was disciplined in 2015. Plaintiff's termination was consistent with its disciplinary policy, and there is no indication that plaintiff's gender affected Topre's decision to end her employment.

Plaintiff also takes issue with Topre's use of the "circle sheet" to ratify termination recommendations. Plaintiff asserts that the "circle sheet" could be viewed as a "facade to give third parties the impression that termination decisions are thoroughly reviewed."[50] This inference is unsupported by the record.

Finally, plaintiff claims that Topre strategically filled her position with a woman after receiving plaintiff's charge of discrimination. Specifically, she contends that this action amounts to "suspicious timing," and that the woman was selected in order to subvert plaintiff's discrimination claim.[51] Again, this assertion is unsupported by the record.

Viewing the record as a whole, the court concludes that plaintiff has failed to present a "convincing mosaic of circumstantial evidence" that would lead to an inference that her termination was tainted by gender discrimination.

## III. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is

---

[50] Doc. no. 34 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 28.

[51] *Id.* at 29.

due to be granted.  A Final Judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

     **DONE** this 16th day of June, 2022.

_____
Senior United States District Judge